PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LANA RITTER, | ) | CASE NO. 4:09CV2460 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **MEMORANDUM AND ORDER** |

Plaintiff Lana Ritter ("Ritter") seeks judicial review of the Social Security

Administration's ("Agency" or "Commissioner") final decision denying her application for

Disability Insurance Benefits and Supplemental Security Income pursuant to 42 U.S.C. § 405(g).

After reviewing the administrative record and the applicable legal standards, the Court

finds that the Administrative Law Judge's ("ALJ") decision is based upon proper legal standards

and supported by substantial evidence.  For the reasons below, the Court affirms the

administrative ruling.

## I.  Overview

Ritter, a thirty-nine year old former warehouse laborer whose formal education ended at

the ninth grade, alleged disability due to various physical impairments, including Wolff

Parkinson White Disease, cardiac condition, status post lumbar fusion, degenerative disc disease

with spinal stenosis, diabetes mellitus–type II, a right wrist ganglionic cyst, and a right elbow

(4:09CV2460)

lateral epicondylitis.  ECF No. 13 at 5; (Tr. 25, 141-45, 237, 514-17, 662-63, 688.)  The ALJ

found that Ritter had several physical severe impairments, ultimately, however, he determined

that Ritter "has not been under a disability, as defined in the Social Security Act" because she:

(1) "did not have an impairment or combination of impairments that met or medically equaled

one of the listed impairments;" (2) could perform light work, lift/carry three to five pounds,

stand/walk for four hours, sit for four hours; and change positions every thirty minutes; and (3)

could perform jobs that exist in significant numbers within the national economy.  (Tr.  18, 25.)

## II.  Procedural History

Ritter filed an application for Disability Insurance Benefits and Supplemental Security

Income on April 6, 2004, with an alleged onset date of January 1, 1990.  (Tr. 15, 73-75.)  After

finding several problems with the ALJ's decision underlying the ALJ's denial, and in order to

permit new evidence to be considered, the Appeals Council remanded the matter for further

consideration upon an expanded record.  (TR 14-15.)   On remand, an ALJ conducted a hearing

which Ritter and her counsel attended and medical and vocational experts provided testimony.

(Tr. 14,737-58, 777-84.)  At the conclusion of the hearing the ALJ and Ritter's counsel agreed

that the ALJ had accomplished the tasks assigned on remand by the Appeals Council.

On June 3, 2009, as a result of the review upon remand, the ALJ issued a decision

denying Ritter disability benefits.  (Tr. 14-27.)  The Appeals Council denied Ritter's request for

review, making the ALJ's decision, the Agency's final decision.  (Tr. 6, 14-27.)  Seeking judicial

review of the Agency's final decision, Ritter timely filed a Complaint presenting the following

issues:

(4:09CV2460)

(1)    The ALJ committed substantial error by finding the claimant not credible based upon his misstatement of facts and testimony;

(2)    The ALJ committed substantial error b[y] failing to give good reason for not giving Ms. Ritter's treating physician controlling weight, given uncontradicted medical evidence;

(3)    The ALJ committed substantial error by failing to consider all relevant medical evidence in the file;

(4)    The ALJ committed serious error in failing to evaluate the claimant's allegations of pain as a disabling condition.[1]

ECF No. 13.

### III.  Judicial Review of a Final Agency Decision

Judicial review of the ALJ's decision denying disability benefits is limited to determining whether there is substantial evidence to support the denial decision and whether the Secretary properly applied relevant legal standards.  *Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (citing *Richardson v. Perales*, 402 U.S. 389 (1971).  Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  "Substantial evidence" is "more than a scintilla of evidence, but less than preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

---

[1] Because the errors presented in issues three (3) and four (4) require the same analysis necessary to review issues one (1) and two (2), respectively, the Court will consider issues three (3) or four (4) in conjunction with issues one (1) and two (2).

-3-

(4:09CV2460)

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535, 536 (6th Cir. 1981); *Heston v. Comm'r of Soc. Sec.,* 245 F.3d 528. 535 (6th Cir. 2001). The ALJ's decision must be affirmed if it is supported by substantial evidence even if the reviewing court would have decided the matter differently, and even if substantial evidence also supports a different conclusion.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).  "Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

The substantial evidence standard presupposes that there is a "zone of choice" within which the Agency may proceed without interference from the courts.  *Mullen*, 800 F.2d at 545 (6th Cir. 1986).  A district court may look into any evidence in the record, regardless of whether it has been cited by the ALJ.  *Id.*  The reviewing court, however, may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard*, 889 F.2d at 681; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## IV.  Standard for Establishing Disability

To establish disability under the Social Security Act, a claimant must show that he is unable to engage in substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

-4-

(4:09CV2460)

expected to last for a continuous period of not less than twelve months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3)(A).  The claimant's impairment must prevent him from doing his previous work, as well as any other work existing in significant numbers in the national economy.  *See* 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, Agency regulations prescribe a five-step sequential evaluation.  If a claimant can be found disabled or not at any step of the sequential evaluation, the review ends at that step.  20 C.F.R. § 404.1520(a).  At Step One, the ALJ considers the claimant's work activity.  A claimant is not disabled if engaged in substantial gainful activity, *i.e.*, working for profit.  At Step Two, the ALJ considers the medical severity of the claimant's impairments.  A claimant is not disabled if she does not have a severe medically determinable physical or mental impairment that also meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that are severe and meet the duration requirement.  At Step Three, the ALJ determines whether the claimant's impairment meets or equals one of the criteria of an impairment listed in Appendix 1 while meeting the duration requirement.  *See* 20 C.F.R. § Part 404, Subpart P, Appendix 1.  A claimant is disabled if she has an impairment that meets the listing and the duration requirement.

Before considering the fourth step, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), *i.e.*, the claimant's ability to perform physical and mental work on a sustained basis despite limitations from impairments.  At Step Four, the ALJ considers whether the claimant's RFC permits her to perform past relevant work.

(4:09CV2460)

At the final step, Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant may perform work available in the national economy.  Even if the claimant's impairments prevent her from performing her past relevant work, the claimant is not disabled if other work exists in the national economy that she can perform.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (describing the five-step evaluation).

The claimant bears the burden of proof at Steps One through Four.  *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  *Richardson v. Heckler*, 750 F.2d 506, 509 (6th Cir. 1984) ("A social security disability claimant bears the ultimate burden of proof on the issue of disability.").  This means that the claimant bears the ultimate burden of proof regarding the issues of disability and the establishment of a disability onset date.  *See* 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled"); *McClanahan v. Comm'r of Soc. Security*, 474 F.3d 830, 836 (6th Cir. 2006).

At Step Five of the sequential evaluation, the burden shifts to the Agency to identify "a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1512(a); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("[T]he [Agency] bears the burden of proof at [S]tep [F]ive, which determines whether the claimant is able to perform work available in the national economy.").

(4:09CV2460)

## V. Discussion

### A.  Credibility Determination

Disability determinations involving physical ailments by necessity require a credibility

determination.  Since 1984,

> an individual's statements describing pain or other symptoms, alone, is not
> sufficient evidence of disability.  There must be attendant medical findings,
> established by medically acceptable clinical or laboratory diagnostic techniques,
> which show the existence of a medical impairment that could be expected to
> produce the pain or other symptoms to the extent alleged.

Pub. L. 98-460 (amending 42 U.S.C. § 423(d)(5)).  The Court's review of Agency credibility

determinations is aided by relevant regulations and case law.

### 1.  Legal Authority

#### a.  Regulatory Standard for Evaluating Credibility

In determining whether a claimant is disabled, the ALJ is required to consider all

symptoms, including pain, and the extent to which those symptoms can reasonably be accepted

as consistent with objective medical evidence.  20 C.F.R. § 404.1529(a).  The ALJ must also

consider the claimant's own statements about her pain in addition to other symptoms, as well as

the effect those symptoms have on the claimant's daily activities and ability to work.  *Id.*  In

considering the claimant's statements regarding her symptoms, the ALJ must make a credibility

determination--he must ultimately decide how much to believe of what the claimant reports.

Credibility determinations regarding a claimant's subjective complaints rest solely with the ALJ.

*See Hopkins v. Comm'r of Soc. Sec.*, 96 Fed. Appx. 393, 395 (6th Cir. 2004).

(4:09CV2460)

Title 20 C.F.R. § 404.1529(c)(1) provides that, if the medical signs or laboratory findings show that a claimant has a "medically determinable impairment that could reasonably be expected to produce" his or her symptoms, such as pain, then the Commissioner will evaluate the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's capacity for work.  In conducting such an evaluation, the Commissioner will consider objective medical evidence and other evidence, including the claimant's history, the signs and laboratory findings, statements from the claimant, statements from the claimant's treating or non-treating source, statements from other persons, and medical opinions.  To the extent relevant or otherwise necessary, the Commissioner should consider the following factors identified in 20 C.F.R. § 404.1529(c)(3):

> 1. Daily activities;
> 2. Location, duration, frequency, and intensity of pain or other symptoms;
> 3. Precipitating and aggravating factors;
> 4. Type, dosage, effectiveness, and side effects of medication;
> 5. Treatment, other than medication;
> 6. Other measures used to relieve pain; and
> 7. Other factors relating to functional limitations and restrictions.

The Commissioner must also consider "whether there are any inconsistencies in the evidence, and the extent to which there are any conflicts between [claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4).

### b.  Binding Case Law Regarding Credibility Determination

To animate the regulatory requirement, the Sixth Circuit developed a two-pronged test to evaluate subjective complaints of pain.  *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986).  According to *Duncan*, the ALJ should initially determine "whether

-8-

(4:09CV2460)

there is objective medical evidence of an underlying medical condition." *Id.*  If so, the ALJ then determines "whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or . . .  whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*

In reporting the credibility of a claimant's statements, the ALJ must include specific reasons "supported by evidence in the record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for the weight." SSR 96-7p; *see also* *Cross*, 373 F. Supp.2d at 733.  Social Security Regulation 96-7p further instructs that "[t]he finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p.

### 2. Ritter's Arguments Regarding the ALJ's Credibility Determination

Ritter alleges that the ALJ failed to support his credibility determination with specific reasons as required by 20 C.F.R. § 404.1529(c) and SSR 96-7p.  Specifically, Ritter claims that the ALJ erred by making the following determinations:

> (1)  The ALJ's finding that [there] is "no evidence" to support Ritter's assertion that "prior to surgery [] she 'couldn't do anything and that she had trouble walking, standing, and sitting'. . . and that her surgery not only did not provide her with any relief but aggravated her back condition." ECF No. 13 at 8; (Tr. 18.)  Ritter avers that the record supports her assertion of pain prior to the surgery because "her conditions were severe enough to warrant surgery." ECF No. 13 at 8.  Ritter also alleges that the record supports her assertion of pain post surgery because "she began experiencing left leg give-way resulting in at least one serious fall where [she] broke her nose and injured her knee." ECF No. 13 at 8; (Tr. 637.)

(4:09CV2460)

(2)    The ALJ's finding that there is "no evidence" of record that "[t]he claimant further testified that she treats with Dr. Veres for her diabetes and that Veres has prescribed a walker for her." <u>ECF No. 13 at 9</u>; (Tr. 19.)  Ritter claims that Dr. Veres prescribed her a "wheeled walker."  <u>ECF No. 13 at 9</u>; (Tr. 634.)

(3)    The ALJ "misstated the evidence, and the transcript" when he stated that Ritter "drives" an automobile because Ritter testified that she does not do any driving. <u>ECF No. 13 at 9</u>; (Tr. 774.)

Despite Ritter's contentions to the contrary, the ALJ provided sufficient reasons for his credibility determination and adhered to the protocol established in *Duncan,* the governing regulation and policy interpretations.  After determining that Ritter suffered from severe underlying medical conditions, the ALJ found that Ritter's impairments could reasonably produce the symptoms alleged, but that her statements regarding the intensity, persistence, and limiting effects of pain were inconsistent with the residual functional capacity assessment.[2]  (Tr. 18.)  In essence, the ALJ understood the record to show Ritter to be capable of a greater level of activity than she admitted.  In making this final determination, the ALJ specified several of the reasons in support.

In evaluating Ritter's credibility prior to surgery, the ALJ punctuated Ritter's noncompliance with prescribed treatment through several examples.  (Tr. 21.)  He detailed that examining physician Dr. Massullo's finding that Ritter is "non-compliant with her medication and continues to smoke."  (Tr. 21.)  Ritter's non-compliance "complicated her condition."  (Tr. 21.)  The ALJ's report reflects Dr. Massullo's explanation that Ritter would be compromised to

---

[2] Ritter's severe medical conditions include degenerative disc disease with mild spinal stenosis, status-post lumbar fusion; Wolffe Parkinson's White Syndrome; diabetes mellitus, type II.  (Tr. 17.)

(4:09CV2460)

operate heavy machinery; Dr. Massullo, however, also concluded that "it is hard to say because she is non-compliant with treatment." (Tr. 21, 194.) The ALJ was also impressed by Dr. Massullo's finding, based upon a comprehensive examination, that Ritter "was able to perform work-related activities including sitting, standing, walking, carrying, hearing, speaking, and traveling." (Tr. 21, 190-99.)

The ALJ also highlighted inconsistencies in Ritter's testimony regarding her physical capabilities prior to surgery. (Tr. 18-19). Ritter testified that prior to surgery "she could not do anything and that she had trouble walking, standing, and sitting." (Tr. 18.) Contrastingly, Ritter also testified that prior to surgery, "she could walk and stand for 10 to 15 minutes, sit for 25 to 30 minutes." (Tr. 19.)

In evaluating Ritter's credibility post-surgery, the ALJ highlighted treating physician Dr. Siegal's opinions that are relevant to Ritter's subjective complaints of pain. After Dr. Siegel performed surgery on Ritter's back, he was unable to explain Ritter's continued, post-surgical complaints of pain. (Tr. 21.) Dr. Siegel not only failed to render an opinion regarding Ritter's ability to perform work activities, but failed to provide a medical source statement. (Tr. 21.) Specifically, Dr. Seigal reported that Ritter's "MRI looks ok. The CT shows a very nice fusion. We would recommend a Cleveland Clinic pain management consult and treatment. I am at a loss as how to proceed at this point and would like the[ir] input and for them to take over her care for chronic pain management." (Tr. 21, 616)

The ALJ explained that the "records indicate that the claimant fell due to what she described as a fainting spell," opposed to Ritter's (more recent) allegations that "she began

-11-

(4:09CV2460)

experiencing left leg give-way resulting in at least one serious fall where [she] broke her nose

and injured her knee."  ECF No. 13 at 8; (Tr. 637.)  Ritter testified in pertinent part:

> I was trying to do dishes so I had the chair over at the sink so I could hold, you
> know, have something for a [l]everage.  And I had my right knee on it and then
> my knee on it and then my leg gave out on me and that's when the chair came up
> and smacked me in my face.  (Tr. 768.)

> And the medicine I'm on, it makes me tired where I've got to take naps.  I get real
> sweaty, dizzy, and lightheaded, sometimes pass out.  I don't have to be [doing]
> nothing, they just come on.  (Tr. 769-70.)

The ALJ noted that "the claimant's nasal fracture and facial laceration are only temporary and

there is no indication whatsoever that they impacted, or would impact, the claimant's ability to

perform work within the confines of her residual functional capacity."  (Tr. 24.)

Although not dispositive, the ALJ's belief that Ritter's testimony about whether she

"drives" and whether Dr. Veres had prescribed a walker for her were not supported by the record

are not entirely correct.  (Tr. 19.)  The record reflects that when the ALJ asked Ritter "do you do

any driving," Ritter testified "no"; she then explained that "it's been a couple of months since

[she] drove," citing "blackout spells" and poor vision as deterrents.  (Tr. 774.)  Ritter suggests

that a "Doctors[ph] Care" note that is only marginally legible is evidence that Dr. Veres did

prescribe Ritter a "wheeled walker."  (Tr. 634.)  The Court accepts Ritter's decipher and

understands why even the most diligent ALJ may have read that script differently.

Despite these misinterpretations, there is adequate evidence to support the ALJ's

credibility determination, rendering any error harmless.  *See Coleman v. Astrue*, 2010 WL

4094299 at *17 (M.D. Tenn. 2010).  For example, Ritter testified that she washes the dishes and

completes daily household chores.  (Tr. 774.); *Id.*  ("The ALJ misconstrued some of Plaintiff's

-12-

(4:09CV2460)

reported daily activities . . .[h]owever, there is adequate evidence other than that which the ALJ

misconstrued to support her conclusions, rendering this harmless error.").

 The ALJ's written decision details a sufficient evaluation of several factors, such as daily

activities, precipitating and aggravating factors, and treatment.  As importantly, the ALJ's

opinion makes clear to subsequent reviewers the weight he attached to Ritter's self-described

complaints of pain, the affects of that pain on her abilities and the reasons why he found her not

entirely credible.  Accordingly, the ALJ's decision comports with the processes outlined in the

regulation, its interpretation and relevant case law.   *See* 20 C.F.R. § 416.929; SSR 96-7p.

### B.  Treating Physician Determination

 Opinions of treating physicians or psychologists are entitled to controlling weight under

the treating physician rule as long as they are (1) well supported by medically acceptable data,

and (2) not inconsistent with other substantial evidence of record.  *Bogle v. Sullivan*, 998 F.2d

342, 347-48 (6th Cir. 1993); 20 C.F.R. § 404.1527(d)(1); SSR 96-2p.  When an ALJ does not

give a treating physician's opinion controlling weight, he must consider the following factors:

"the length of the treatment relationship and frequency of examination, the nature and extent of

the treatment relationship, supportability of the opinion, consistency of the opinion with the

record as a whole, and specialization of the treating source."  *Wilson*, 378 F.3d at 544 (discussing

20 C.F.R. § 404.1527(d)).  These principles are collectively referred to as the treating physician

rule.

 An additional procedural requirement of the treating physician rule is that, when an ALJ,

discounts a treating physician's opinion, he must provide "good reasons" that are "sufficiently

-13-

(4:09CV2460)

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." SSR 96-2p; *see also* Wilson, 378 F.3d

at 544.  This notice requirement is significant because it ensures that a claimant who has been

denied benefits receives fair process.  As importantly, the "good reasons" rule "'exists, in part, to

let claimants understand the disposition of their cases,' particularly in situations where a claimant

knows that his physician has deemed him disabled and therefore 'might be especially bewildered

when told by an administrative bureaucracy that [he] is not, unless some reason for the agency

decision is supplied.'" Wilson, 378 F.3d at 544 (quoting Snell v. Apfel, 177 F.3d 128, 134 (2d

Cir.1999)).  An ALJ's failure to follow this requirement of providing good reasons "for

explaining precisely how those reasons affected the weight accorded the [physician's] opinions

denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

based upon the record." Rogers, 486 F.3d at 243 (citing Wilson, 378 F.3d at 544).

### 1.  The ALJ Properly Weighed the Medical Opinion of Treating Physician Veres

Ritter argues that the ALJ erred by failing to give good reason for discounting long-term

family practitioner Dr. Veres' medical opinions.  Dr. Veres has treated Ritter for "at least a

decade" and diagnosed Ritter with a right dorsal ganglio cyst, a right elbow lateral epicondylitis,

dequervain's tenosynovitis, and a marking limitation in handling.  (Tr. 614, 649, 652.)  Dr. Veres

opined that Ritter's condition limited her to lift/carry less than ten pounds; required a sit/stand

option as needed; and the claimant can never climb, stoop, crouch, or kneel; along with

limitations with upper and lower extremities and in reaching and handling.  (Tr. 570.)

-14-

(4:09CV2460)

At the threshold, it is important to acknowledge that, although the ALJ did not attribute controlling weight to Dr. Veres' opinion, the ALJ did not reject Veres' opinion.  Rather, the ALJ partially adopted Dr. Veres' opinion as evidenced in the ALJ's articulation that Dr. Veres' findings are "consistent with the claimant's residual functional capacity . . . [and] I have largely relied on these findings . . . ."  (Tr. 23.)

In discounting some of Dr. Veres' findings, the ALJ specified,

Exhibit 8F, page 30, shows that the claimant, pursuant to MRI testing, had lumbar disc disease with left leg radiculopathy (exhibit 8F, page 30).  The claimant received epidural steroid injections to the lower back (exhibit 8F).  The March 11, 2004 statement of Dr. Veres is not given any significant weight, since it is entirely conclusory, not consistent with the evidence of record, and completed on a standardized state welfare form without any specific rationale to support its conclusions as to the claimant's limitations in working . . . .

(Tr. 21.)  The ALJ further noted that Dr. Veres' finding that Ritter could return to work on September 20, 2004.  (Tr. 22, 260.)  The ALJ explained that "Dr. Veres' findings [are] entitled to little weight, since it does not provide any objective finding regarding the claimant's ability to work; rather, he relies entirely on the claimant's subjective allegations."  (Tr. 22.)  The ALJ further reasoned that Dr. Veres' reliance on Ritter's assessment of her ability to work is inherently flawed.  (Tr. 22.)

Having found that some of Dr. Veres' opinions regarding Ritter's impairments were conclusory and not well-supported or contradicted by other substantial evidence in the record, the ALJ was not required to award Dr. Veres' opinion controlling weight.  The ALJ, however, paid proper deference to Dr. Veres' role as a treating physician, and as required specified his reasons for according Dr. Veres' opinions less than controlling weight.

-15-

(4:09CV2460)

## C. The ALJ Appropriately Evaluated the Findings of Dr. Siegal

Ritter argues that the ALJ erred by disregarding surgeon Dr. Siegal's opinion that Ritter

had a herniated disc because the results of contemporaneous diagnostic testing showed a disc

protrusion, not a herniated disc. *See* ECF No. 13 at 12; (Tr. 23.) Ritter argues that Dr. Siegal,

"who both pre-operatively and post-operatively diagnosed a herniated nucleus pulpous, is in a

better position to diagnose [her] than the ALJ." ECF No. 13 at 12. The problem with this

argument is, although Dr. Siegal found Ritter to have a herniated disc (a finding that is

inconsistent with others in the record), Dr. Siegal did not render an opinion as to her ability to

work, a critical issue in this case. (Tr. 21.) It appears, therefore, that the ALJ is being charged

with rejecting an opinion that was never offered.[3]

In remarking about this omission, the ALJ stated "Dr. Siegal never provided a medical

source statement. Thus, in essence, he has no opinion of record regarding the claimant's ability

to work (which is significant, since he, as noted, performed surgery on the claimant's lower

back)." (Tr. 21.) Because Dr. Siegal failed to issue an opinion as to Ritter's functional

limitations and was also unable to discern any objective, physical impairments responsible for

Ritter's subjective allegations, the ALJ had no opinion of Ritter's work-related abilities to reject.

(Tr. 21-22, 24, 616, 745-46.)

---

[3] Although neither Ritter nor the ALJ expressly claim that Dr. Siegal was a treating physician, the ALJ, nevertheless, carefully articulated his reasoning for finding Dr. Siegal's medical findings "not consistent with the evidence of record." (Tr. 23.) In fact, Ritter distinguishes, Dr. Seigal from her treating physician: "[a]ll of the physical doctors who evaluated her, *from Dr. Veres, the treating physician to surgeon Dr. Joel Seigal*, and to medical expert Dr. Balk . . ." ECF No. 13 at 15.

(4:09CV2460)

Resigned to not understanding a functional reason for Ritter's continued complaints of pain post-surgery, in 2007, Dr. Siegal reported that Ritter's "MRI looks ok.  The CT shows a very nice fusion.  We would recommend a Cleveland Clinic pain management consult and treatment.  I am at a loss as how to proceed at this point and would like the[ir] input and for them to take over her care for chronic pain management."  (Tr. 21, 616.)  Recognizing that Dr. Siegal "never imposed any limitations of functioning on [Ritter]" the ALJ found "the credible testimony of the medical expert, Dr. Ba[]lk, is consistent with the findings of Dr. Siegal's failure to find any cause for the claimant's alleged continued back pain after the surgery in providing his testimony at the hearing)."  (Tr. 22.)

In addition to failing to opine on Ritter's ability to work, the ALJ found Dr. Siegal's diagnosis of a herniated disc inconsistent with other contemporaneous diagnostic testing.  The ALJ explained that, despite November 2004 test results showing "only degenerative changes at the L4-L5 level, with disc protrusion (and not herniation)," Dr. Siegal remained under the impression that Ritter had a herniated disc at L4-L5 level, in stark contrast to objective evidence .  (Tr. 23, 562.)  The ALJ explained that the contemporaneous assessments of the diagnostic tests and overall record reflect that Ritter does not have a herniated disc–"Simply: a disc protrusion is not a herniated disc."  (Tr. 23, 252, 282, 552, 663.)

Additionally, in 2003, reports from Trumbull Memorial Hospital showed that Ritter's MRI did not show herniation, but rather only central disc protrusion with mild spinal stenosis at the L4-L5 level and disc disease with mild spinal stenosis at the L5-S1 level.  (Tr. 22, 552.)  In 2004, treating physician Dr. Veres reported that Ritter's MRI showed at "L4-L5 . . . evidence of

-17-

(4:09CV2460)

degeneration with a mild-to-moderate central disk protrusion," and not a herniated disc. (Tr. 22, 553.) In 2007, Dr. Cestone reported that Ritter's MRI showed "only a small to moderate central protrusion at L4-L5 level with only some mild stenosis of the lower recess and no other significant abnormalities." (Tr. 23, 565.)

Relying upon"contemporaneous assessments of []diagnostic tests of record, such as [] x-rays and MRIs [and the reports of] radiologists, specialists in interpreting such records," the ALJ noted that "none of the examining radiologists made [a finding of a herniated disc]" and determined that "their findings should be given greater weight than Dr. Siegal['s]." (Tr. 23.) Based upon the record, the ALJ's decision not to rely on Dr. Seigal's opinion is supported by substantial evidence and is in accordance with appropriate legal authority.

Overall, the record supports the ALJ's determinations regarding the medical findings of Dr. Veres and Dr. Siegal and his articulation of his reasoning sufficiently explains the reasons for his rulings.

### VI. Conclusion

To the extent Ritter intended to make a general claim that the ALJ was inattentive to the relevant medical evidence in the record (Issue 3), the ALJ's detailed written analysis belies any concern of inattention paid by the ALJ to relevant medical evidence in the record. The failure to read Dr. Veres' near illegible hand-writing as being a prescription for a walker is entirely understandable, given the handwriting specimen. Regarding the claim that Ritter's pain alone should substantiate her disability, even Dr. Siegal, her surgeon, punted because he was unable to satisfy himself that Ritter's complaints of pain were organic.

(4:09CV2460)

The substantial evidence standard presupposes that there is a "zone of choice" within which the Agency may proceed without interference from the courts.  The ALJ's decision clears that hurdle handily, as the ALJ's determinations are supported by substantial evidence, well articulated, and reflects the use of appropriate legal standards, in support of the ALJ's conclusion that Lana Ritter was not disabled as defined by the Social Security Act and, therefore, is not entitled to benefits.

Accordingly, the ALJ's decision denying benefits is affirmed.


IT IS SO ORDERED.


March 31, 2011_____              __/s/ Benita Y. Pearson_____
Date                                  United States Magistrate Judge